## UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF OKLAHOMA

SUSAN BANKS et al.,                      )
                                         )
     Plaintiffs,                        )
                                         )
v.                                       )     Case No. CIV-23-576-G
                                         )
INDEPENDENT SCHOOL DISTRICT              )
OF OKLAHOMA,                             )
EPIC CHARTER SCHOOLS,                    )
                                         )
     Defendant.                         )

## <u>ORDER</u>

Now before the Court is a Motion to Dismiss (Doc. No. 8) filed by Defendant Independent School District of Oklahoma, Epic Charter Schools ("Epic").[1]  Plaintiffs Susan Banks, Shannon Franklin, Martha Islas, and Danette Propst have responded in opposition.  *See* Pls.' Resp. (Doc. No. 11).  Defendant has replied.  *See* Def.'s Reply (Doc. No. 12).  Both parties also have filed supplemental briefs regarding authority issued after initial briefing was complete.  *See* Def.'s Suppl. Br. (Doc. No. 17); Pls.' Suppl. Br. (Doc. No. 18).

### I. Background

Plaintiffs are four former employees of Defendant who allege that they were terminated from their employment on or about November 19, 2021.  *See* Compl. ¶¶ 8-9 (Doc. No. 1).  Plaintiffs claim that Defendant, a statewide virtual charter school and "a

---

[1] Defendant identifies itself as "Community Strategies, Inc., doing business as Epic Charter Schools" but has not requested amendment of the pleadings.  Def.'s Mot. at 6 n.1.

political subdivision of the State of Oklahoma," is liable for violation of the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. §§ 621 et seq. *See* Compl. ¶¶ 5, 65-96.

Defendant seeks dismissal for "lack of subject-matter jurisdiction" under Federal Rule of Civil Procedure 12(b)(1). Fed. R. Civ. P. 12(b)(1). Defendant argues that the State of Oklahoma is immune from Plaintiff's ADEA claims under the Eleventh Amendment to the United States Constitution and that Defendant, as an "arm of the state," is also entitled to immunity. Plaintiffs object that Defendant has not shown that it is entitled to such immunity.

## II. Standard of Decision

"Federal courts are courts of limited jurisdiction. They possess only that power authorized by Constitution and statute, which is not to be expanded by judicial decree." *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994) (citations omitted). As the party asserting federal jurisdiction, Plaintiffs bear "the burden of alleging the facts essential to show jurisdiction." *U.S. ex rel. Stone v. Rockwell Int'l Corp.*, 282 F.3d 787, 797 (10th Cir. 2002) (internal quotation marks omitted).

A Rule 12(b)(1) motion for lack of subject-matter jurisdiction takes one of two forms: a facial attack or factual attack. *Pueblo of Jemez v. United States*, 790 F.3d 1143, 1148 n.4 (10th Cir. 2015). Although Defendant does not specify, its challenge is reasonably characterized as a factual attack on Plaintiffs' allegations, as the Motion goes "beyond allegations contained in the complaint and challenge[s] the facts upon which subject matter jurisdiction depends." *Id.* (internal quotation marks omitted); *see, e.g.*, Wynn Decl., Def.'s

Mot. Ex. 1 (Doc. No. 8-1).  When reviewing such a factual attack, a district court may not "presume the truthfulness of the complaint's factual allegations." *Pueblo of Jemez*, 790 F.3d at 1148 n.4 (internal quotation marks omitted).  The court instead "has wide discretion to allow affidavits, other documents, and a limited evidentiary hearing to resolve disputed jurisdictional facts." *Id.* (internal quotation marks omitted).[2]

III. *Discussion*

Defendant Epic argues that Oklahoma's legal framework for the establishment and recognition of statewide virtual charter schools (including under Oklahoma's Charter Schools Act ("the Act"), Okla. Stat. tit. 70, §§ 3-130 et seq.) and facts relevant to Epic's governance and operations (including that Epic has students in every Oklahoma county, has its own governing board that sets its curriculum and makes operational decisions, and is subject to oversight by Oklahoma's Statewide Charter School Board) render Epic an arm of the state for purposes of Eleventh Amendment immunity.  *See* Def.'s Mot. at 1.  If that is so, Epic would be immune from being sued in federal court on Plaintiff's ADEA claims.

A. *Eleventh Amendment Immunity and Assessment of Whether an Entity Qualifies as an Arm of the State*

"Whether a defendant is immune from suit under the Eleventh Amendment . . . [is] [a] question[] of the federal courts' subject matter jurisdiction." *Murray v. Colorado*, 149 F. App'x 772, 774 (10th Cir. 2005).  "The Eleventh Amendment states that "[t]he Judicial power of the United States shall not be construed to extend to any suit in law or equity,

---

[2] The Court finds that an evidentiary hearing is not necessary and would not materially assist the Court is making its determination.

commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State.'" *Good v. U.S. Dep't of Educ.*, 121 F.4th 772, 788 (10th Cir. 2024) (alteration in original) (quoting U.S. Const. amend. XI), *petition for cert. filed*, No. 24-992 (U.S. Mar. 18, 2025). "Notwithstanding its plain language," the Eleventh Amendment "has long been understood to have a broader reach": it "generally bars suits against a state in federal court commenced by citizens of that state or citizens of another state." *Id.* (emphasis and internal quotation marks omitted); *see also id.* at 788 n.7. The Eleventh Amendment "embodies the privilege of the sovereign not to be sued without its consent" and, in practice, "operates as a jurisdictional bar that precludes unconsented suits in federal court against a state." *Id.* at 788-89 (internal quotation marks omitted).

Immunity under the Eleventh Amendment "extends beyond states themselves to encompass governmental entities that are arms of the state." *Id.* at 789 (internal quotation marks omitted). "[T]he arm-of-the-state doctrine bestows immunity on entities created by state governments that operate as alter egos or instrumentalities of the states." *Id.* (internal quotation marks omitted). Although "[t]he arm-of-the-state inquiry is ultimately a matter of federal law," "arm-of-the-state status must be determined in each case by reference to the particular state laws characterizing the entity." *Id.* at 790 (internal quotation marks omitted). The burden to establish that an entity is an arm of the state rests upon the party asserting that is so. *Id.*

The Tenth Circuit has identified a two-step process for assessing whether an entity is an arm of the state. *See Hennessey v. Univ. of Kan. Hosp. Auth.*, 53 F.4th 516, 528-29 (10th Cir. 2022). The arm-of-the-state inquiry begins with considering the following four

"*Steadfast* factors": "(a) the characterization of the entity under state law; (b) the entity's autonomy; (c) the entity's finances and financial independence; and (d) whether the entity is concerned with state or local affairs." *Good*, 121 F.4th at 798 (citing *Steadfast Ins. Co. v. Agric. Ins. Co.*, 507 F.3d 1250, 1253 (10th Cir. 2007)). If those factors "point in different directions," the Court next considers "the Eleventh Amendment's twin reasons for being: protecting a state's dignitary interests and protecting a state treasury." *Id.* at 795, 818.

### B. Whether Epic Is an Arm of the State

Defendant argues that analysis of the relevant factors establishes that it is an arm of the state for purposes of Eleventh Amendment immunity. The Court discusses each consideration in turn.

#### 1. The *Steadfast* Factors

##### a. The Character Ascribed to Epic Under State Law

"The focus of this factor is on how state statutes and other sources of state law characterize the entity." *Good*, 121 F.4th at 798-99. In addressing this factor, courts should "consider relevant state statutes, regulations, court decisions, and constitutional provisions." *Id.* at 799.

According to the Supreme Court of Oklahoma, "a charter school is a public school, sponsored by an entity such as a school district . . . or the State Board of Education." *Drummond ex rel. State v. Okla. Statewide Virtual Charter Sch. Bd.*, 558 P.3d 1, 6 (Okla. 2024) (citing Okla. Stat. tit. 70, § 3-132), *aff'd*, 605 U.S. 165 (2025) (per curiam). "Charter schools use innovative methods and forms of accountability, provide academic choices for students and parents, and offer different professional opportunities for teachers and

administrators." *Id.* Like all Oklahoma charter schools, Epic is a "creature[] of state law" that shares "many of the same privileges, responsibilities, and legal requirements that govern traditional public schools." *Id.* at 11.

Importantly here, the fact that charter schools are treated by the State of Oklahoma as public school districts in certain ways and for certain purposes is not sufficient, by itself, to show that charter schools operate as alter egos or instrumentalities of the State. "Under the arm-of-the-state doctrine, courts classify state governmental bodies according to a dichotomy, in which arms of the state enjoy Eleventh Amendment immunity, whereas political subdivisions such as counties and cities do not." *Mascheroni v. Bd. of Regents of Univ. of Cal.*, 28 F.3d 1554, 1559 (10th Cir. 1994), *abrogated on other grounds by Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101 (2002); *see also Steadfast Ins. Co.*, 507 F.3d at 1253 ("If a state entity is more like a political subdivision—such as a county or city—than it is like an instrumentality of the state, that entity is not entitled to Eleventh Amendment immunity."). Public school districts in Oklahoma have long been considered political subdivisions and not arms of the State, meaning that while they are state-created entities they are *not* protected by Eleventh Amendment immunity. *See Dowell v. Bd. of Educ. of Indep. Sch. Dist. No. 89 of Okla. Cnty.*, 71 F.R.D. 49, 57 (W.D. Okla. 1976) (holding that an Oklahoma school district was "not the state or [an] arm of the state within the meaning of the Eleventh Amendment" but "merely a political subdivision of the State"); Okla. Stat. tit. 51, § 152(12)(b) (Oklahoma Governmental Tort Claims Act defining the State's political subdivisions to include "school district[s]"). As a result, to establish that it is an arm of the state for purposes of Eleventh Amendment immunity, Epic

must show that it differs from an ordinary Oklahoma school district in a way that makes it more like an instrumentality of the State than a political subdivision within the State.

Defendant points to the Charter Schools Act's prescription that "[a] charter school or virtual charter school shall be considered a school district for purposes of tort liability under The Governmental Tort Claims Act." Okla. Stat. tit. 70, § 3-136(A)(12). Defendant emphasizes that the effect of this provision is to grant Epic the same immunity from tort claims that is granted to the State of Oklahoma. *See* Def.'s Mot. at 8. But such immunity is also granted to public school districts and other Oklahoma political subdivisions—which are not arms of the state. *See* Okla. Stat. tit. 51, § 152.1 ("The state, its political subdivisions, and all of their employees acting within the scope of their employment . . . shall be immune from liability for torts.").

Defendant also highlights the administrative framework that applies to Oklahoma charter schools under the Charter Schools Act. Pursuant to the Act, the Statewide Charter School Board (the "Charter School Board") is given the "sole authority to sponsor statewide virtual charter schools" within the State of Oklahoma. Okla. Stat. tit. 70, § 3-132.1(A). Defendant argues that this authority reflects arm-of-the-state status because the Charter School Board thereby acts as an extension of the State of Oklahoma. *See* Def.'s Mot. at 13-17. Even accepting that the authority granted to the Charter School Board under the Act might make the Board *itself* an arm of the state for Eleventh Amendment purposes, the point is unavailing. The statute grants no such sponsorship authority to Epic, who is the party claiming immunity here.

Courts also consider "relevant . . . court decisions" in assessing how state law characterizes an entity. *Good*, 121 F.4th at 799. The Oklahoma Supreme Court recently provided guidance in assessing the character of Oklahoma charter schools in *Drummond ex rel. State v. Oklahoma Statewide Virtual Charter School Board*, 558 P.3d 1. In that decision, the Oklahoma Supreme Court considered, among other questions, whether a religious virtual public charter school qualified as a state actor. *See id.* at 11-13. In so doing, the state appellate court explained: "Oklahoma charter schools are entwined with the State. Governmental entities serve as sponsors for the charter schools." *Id.* at 11. In the Oklahoma Supreme Court's view, the State of Oklahoma by passing the Charter Schools Act "exercised its sovereign prerogative to treat [public charter schools] as public institutions that perform the traditionally exclusive government function of operating the State's free public schools." *Id.* at 12-13. In other words, the Act authorizes the use of charter schools "to help" the Oklahoma Legislature "carry out" its "constitutional duty to establish a system of free public schools." *Id.* at 6.

The Court does not conclude that the Oklahoma Supreme Court's description of the purpose and framework of Oklahoma's charter school system should be read as suggesting that each charter school authorized within that system is an extension or instrumentality of the state government. What emerges from *Oklahoma Statewide Virtual Charter School Board* is the view that, pursuant to the Oklahoma Charter Schools Act, a body—the Charter School Board—has been established and given authority to contract with private entities, such as Epic, to educate a specific, self-selecting constituency (children whose families would choose for them to attend the particular charter school rather than the local public

8

school).  While this view led the state appellate court to conclude that charter schools are state actors, it does not reasonably follow that each individual charter school contracting with the Charter School Board amounts to an "alter ego" or "instrumentality" of the State of Oklahoma for Eleventh Amendment purposes.

"[N]ot all entities created by states are meant to share state sovereignty.  Some entities may be part of an effort at privatization, representing an assessment by the state that the private sector may perform a function better than the state."  *Hennessey*, 53 F.4th at 529 (alteration and internal quotation marks omitted); *cf. Okla. Statewide Virtual Charter Sch. Bd.*, 558 P.3d at 8 (concluding that the relevant public charter school "is an instrument of the Catholic church").  Here, Oklahoma law is most reasonably read as viewing charter schools such as Epic as political subdivisions, just like Oklahoma school districts.  The decision of the Oklahoma Supreme Court in *Oklahoma Statewide Virtual Charter School Board* does not undermine this conclusion.  In sum, then, Oklahoma's statutes and other state authorities do not support a finding that Oklahoma law characterizes charter schools like Epic as arms of the state.

### b.  The Autonomy Accorded Epic Under State Law

The autonomy afforded to Epic under state law "hinges upon the degree of control the state exercises over" Epic.  *Good*, 121 F.4th at 793 (internal quotation marks omitted).

> This is the most complex of the *Steadfast* factors because it spans a broad range of considerations.  Relevant sub-factors and considerations include (i) the control of the entity by the governor and the legislature; (ii) whether the entity's employees are classified as state employees; (iii) whether the entity has ownership or control of property; (iv) whether the entity has the ability to form its own contracts with government entities and commercial enterprises; (v) whether the entity has the ability to set its own policies

without state oversight; and (vi) whether the entity has the ability to bring
suit on its own behalf.  But these considerations are not an exhaustive list.

*Id.* at 802 (citations and internal quotation marks omitted).  The Tenth Circuit has cautioned courts "not to become caught up in the minutiae": "the key inquiry is whether, in light of the entire relationship between the entity and the state, the entity retains substantial autonomy or if it operates with guidance or interference from the state."  *Id.* (omission and internal quotation marks omitted).

Defendant argues that the State of Oklahoma exercises significant supervision and control over Epic, thus showing that the second *Steadfast* factor of autonomy weighs in favor of finding that Epic is entitled to Eleventh Amendment immunity.  *See* Def.'s Mot. at 17-22; *see also Good*, 121 F.4th at 792, 802-09.  Defendant contends that the Oklahoma Legislature and the Charter School Board have

implemented a litany of requirements regarding the process of applying to
sponsor a statewide virtual charter school (including the renewal and
termination of contracts for sponsorship of statewide virtual charter schools),
virtual charter schools' information technology systems, ability to enter into
contracts, governing bodies, student attendance, and academic, financial, and
organizational performance.

Def.'s Mot. at 18.  Defendant argues that the imposition of these requirements reflects that the State exercises sufficient control over Epic for Epic to be considered an arm of the State.  *See id.* at 18-22.

Plaintiffs respond that the ways in which Epic is regulated are similar to the ways in which traditional school districts are regulated.  *See* Pls.' Resp. at 6-7; *see also Ambus v. Granite Bd. of Educ.*, 995 F.2d 992, 996 (10th Cir. 1993); *Duke v. Grady Mun. Schs.*, 127 F.3d 972, 979 (10th Cir. 1997).  Plaintiffs further argue that Epic cannot be treated as an

agency, alter ego, or instrumentality of the state because "Epic's governing body is responsible for the management, administration, policies, and operational decisions of the charter school" and "Epic may enter contracts, sue and be sued, and borrow money."  Pls.' Resp. at 6-7; *see* Okla. Stat. tit. 70, §§ 3-136(A)(7), (E), 3-142(E).

When evaluating autonomy in this context, a primary point of inquiry is the level of state control over the entity's governing body.  For example, in finding that local school districts in Utah were political subdivisions and not arms of the state for Eleventh Amendment purposes, the Tenth Circuit gave "significant weight to the fact that local school boards, which consist of members who are *locally elected*, exercise responsibilities free from state control."  *Sutton v. Utah State Sch. for the Deaf & Blind*, 173 F.3d 1226, 1232 (10th Cir. 1999) (emphasis added) (citing *Ambus,* 995 F.2d at 996); *cf. Sturdevant v. Paulsen*, 218 F.3d 1160, 1170 (10th Cir. 2000) ("We have consistently held that . . . local school boards are political subdivisions, even if largely dependent on state funding and subject to state control.")  As a counter-example, in finding that a state university was an arm of the state, the Tenth Circuit "placed emphasis on the fact that the University was controlled by a sixteen-member board of regents, fifteen of whom were *appointed by the Governor*."  *Sutton*, 173 F.3d at 1233 (emphasis added) (citing *Watson v. Univ. of Utah Med. Ctr.,* 75 F.3d 569, 575 (10th Cir. 1996)).

Here, the level of state control over Epic's board more closely resembles that in *Ambus* than that in *Watson*.  The Oklahoma Charter Schools Act requires each charter school to have a "governing board" and provides that this board "shall be responsible for the policies and operational decisions" of the charter school.  Okla. Stat. tit. 70, § 3-

136(A)(7).  Unlike with the Statewide Charter School Board, state officials do not appoint members of individual charter school boards.  *Compare id.*, *with id.* § 3-132.1(A). Somewhat intrusively, the Act and state administrative rules impose residency requirements on who may serve on the governing board of a charter school, but the requirements are modest: the members must be residents of Oklahoma and at least one member must be related to or a guardian of a current or former student.  *See* Okla. Stat. § 3-136(A)(7); Okla. Admin. Code § 777:10-1-3(c).  And the training and conflict-of-interest requirements for charter school board members are "the same" as those for members of local school district boards.  Okla. Stat. tit. 70, § 3-136(A)(7); *see id.* §§ 5-110, -110.1, -113, -124.  While the Charter School Board, which is composed of members appointed by state officials, possesses oversight authority over Epic, there is no indication in the record that Epic's own governing board is appointed or controlled by the State of Oklahoma or its officials.

Operationally and financially, the regulation of Epic by the State is, as with all charter schools, extensive.  Again, however, the relevant regulations are similar or identical to those governing local school districts.  Epic's board must comply with the Oklahoma Open Meetings Act and the Oklahoma Open Records Act, as must all "public bodies" and "public officials."  Okla. Stat. tit. 25, § 303; *id.* tit. 51, § 24A.2; *see id.* tit. 70, § 3-136(A)(15).  Epic "may enter into contracts and sue and be sued," as is true for local school districts.  Okla. Stat. tit. 70, § 3-136(E); *see id.* § 5-105.  Epic is "subject to the same reporting requirements, financial audits, audit procedures, and audit requirements as a school district."  Okla. Stat. tit. 70, § 3-136(A)(5).  When spending funds received from

12

the State, Epic is subject to the State's restrictions on governmental expenditures and, additionally, is required each year to prepare a financial report of income and expenditures. *See id*.

Academically, Epic must comply with state testing programs for students, develop a "performance framework" to identify "academic and operational performance indicators," and submit to annual evaluation by the Statewide Charter School Board based on the school's chosen performance framework. *Id.* § 3-136(A)(3), (18). Charter schools, including Epic, have greater control over their curricula than local school districts, however. *See, e.g.*, *id.* § 3-136(A)(3) ("A charter school or virtual charter school may offer a curriculum which emphasizes a specific learning philosophy or style or certain subject areas such as mathematics, science, fine arts, performance arts, or foreign language.").

In sum, while "the State's entwinement expands to the internal operations and affairs of [Oklahoma] charter schools," *Okla. Statewide Virtual Charter Sch. Bd.*, 558 P.3d at 11, the level of entwinement is comparable to that for ordinary Oklahoma school districts. This factor, on balance, weighs against Epic's status as an arm of the state. *See Good*, 121 F.4th at 805, 807-08.

### c. Epic's Finances and Financial Independence

The next *Steadfast* factor "requires an inquiry into the independence of the entity's finances and the extent to which the state financially supports the entity." *Good*, 121 F.4th at 809. A key component in assessing this factor is "the amount of state funding the entity receives and . . . whether the entity has the ability to issue bonds or levy taxes on its own behalf." *Id.* (internal quotation marks omitted). "The inability of an entity to levy taxes,

combined with its receipt of all or most of its funding from the state, will serve as a strong indicator that the entity is an arm of the state." *Id.* (internal quotation marks omitted).

Defendant contends that its inability to levy taxes or issue bonds weighs in favor of arm-of-the-state status. *See* Def.'s Mot. at 23; Wynn Decl. ¶ 4. Defendant also points to the significant funding it receives from the state as well as the regulations imposed regarding how Defendant must handle its finances. *See* Def.'s Mot. at 22-24; Wynn Decl. ¶¶ 2-3. While Plaintiffs concede that Epic may not issue bonds or levy taxes, Plaintiffs argue that the other ways in which Epic handles its finances and receives funding demonstrate that Epic is not an arm of the state. *See* Pls.' Resp. at 7-9.

Having considered the parties' arguments and relevant authorities, the Court agrees with Defendant. Because Epic receives most of its funding from the State of Oklahoma and cannot issue bonds or levy taxes on its behalf, this factor weighs in favor of Epic being viewed as an arm of the state. *See Good*, 121 F.4th at 809.

### d. Whether Epic Is Concerned Primarily with Local or State Affairs

The final *Steadfast* factor is "whether the entity in question is concerned primarily with local or state affairs." *Good*, 121 F.4th at 817 (internal quotation marks omitted). "In answering this question, we examine the [entity's] function, composition, and purpose." *Id.* (internal quotation marks omitted).

Defendant points to the fact that, as a statewide school, Epic is statutorily required to serve students across Oklahoma. *See* Def.'s Mot. at 25; Okla. Stat. tit. 70, § 3-140(F). Indeed, Epic has enrolled students residing in all 77 counties in Oklahoma. Def.'s Mot. at 25; Wynn Decl. ¶ 6. Plaintiffs respond that despite Epic operating statewide, the school is

14

still concerned with only a segment of Oklahoma's population—i.e., its own student body. *See* Pls.' Resp. at 10-11.

The Tenth Circuit has emphasized that "[g]eography plays an important role in this analysis: if the entity's powers extend across the state, that weighs in favor of arm-of-the-state status." *Good*, 121 F.4th at 817.  As a statewide school, Epic is required to and does serve students from throughout the State of Oklahoma.  Plaintiffs' argument that Epic's student body is only a segment of the state's population is not persuasive, as the same is true of any state agency or instrumentality directed toward a non-geographically defined constituency.  Epic's concern with statewide affairs weighs in favor of its arm-of-the-state status.

### 2.  The Twin Goals of the Eleventh Amendment

As outlined above, the *Steadfast* factors do not all point in the same direction.  Thus, the first step in the arm-of-the-state analysis is not dispositive, and the Court proceeds to the second step: examining the twin goals underlying the Eleventh Amendment.  *See Good*, 121 F.4th at 818.

#### a.  The Impact of a Judgment on the State Treasury

The "foremost" reason to find that an entity is entitled to sovereign immunity "is avoiding state liability for any judgment against the entity."  *Id.* at 819 (internal quotation marks omitted).  "Common sense and the rationale of the Eleventh Amendment do not require that sovereign immunity attach when an agency is structured to be self-sustaining and has a long history of paying its own way."  *Id.* (alteration and internal quotation marks omitted).

Defendant argues in its Reply and Supplemental Brief that Epic is not a self-sustaining entity. *See* Def.'s Reply at 9-11; Def.'s Suppl. Br. at 4-7. But Defendant has not cited any statute, contract, or other governing document supporting the proposition that the State of Oklahoma would be liable for a money judgment against Epic.[3] The only evidence of potential loss to the State provided by Epic is that Epic's survival depends on state funding. This type of practical loss, however, does not implicate the purpose of the Eleventh Amendment. The Tenth Circuit has explained that "[t]he focus of this judgment liability issue is on *direct* legal liability and not on any indirect or practical loss of funds to the state." *Good*, 121 F.4th at 819 (internal quotation marks omitted).

Where a state is not obligated to bear and pay the indebtedness of an enterprise, both legally and practically, then "the state treasury is not at risk" and the Eleventh Amendment's core concern is not implicated. *Id.* (internal quotation marks omitted); *see Hess v. Port Auth. Trans-Hudson Corp.*, 513 U.S. 30, 51 (1994). Here, Defendant has not met its burden to show that Oklahoma has assumed or would be directly responsible for Epic's civil liability in a way that would implicate the goals of the Eleventh Amendment.

*b. Avoiding an Affront to the Dignity of the State*

Safeguarding the dignity of states is a critical function of the Eleventh Amendment. *See Fed. Mar. Comm'n v. S.C. State Ports Auth.*, 535 U.S. 743, 760 (2002). Defendant

---

[3] It is theoretically possible that Oklahoma has assumed the obligation to satisfy a judgment against Epic, either directly or indirectly, by providing virtually all the funds needed for the operation of Epic. *See Fresenius Med. Care Cardiovascular Res., Inc. v. P.R. & The Caribbean Cardiovascular Ctr. Corp.*, 322 F.3d 56, 72 (1st Cir. 2003). But the record before the Court does not establish that any such obligation lies with the State.

argues that Oklahoma's dignity interest extends to suits against Epic because Oklahoma has treated statewide virtual charter schools like Epic as synonymous with the State or an instrumentality of the State. Defendant's argument on this factor is undeveloped but largely rests on the contention that the State of Oklahoma has statutorily characterized Epic as an arm of the state and on the fact that, in ordering an audit of Epic, the Governor relied on a statute authorizing audits of officers of the state rather than the statute authorizing audits of school districts. *See* Def.'s Reply at 3, 11.

"[T]he relevant inquiry involves the question of whether allowing a suit against an entity to go forward would impact a state's dignitary interests." *Good*, 121 F.4th at 819. The Tenth Circuit has provided some guiding principles to use in answering this question. "It would offend the dignity of a state to deny arm-of-the-state status (and, by extension, Eleventh Amendment immunity) to an entity that the state designated to share in its sovereignty." *Id.* at 820. But "finding an entity to be an arm of the state when it was not clearly designated as such would be equally offensive to a state's dignitary interests." *Id.*

As discussed above, Oklahoma has extended statutory immunity to tort claims to charter schools like Epic. *See* Okla. Stat. tit. 51, § 152.1. The "fact that an entity is entitled to immunity under state law does not determine the extent of Eleventh Amendment immunity," however. *Good*, 121 F.4th at 821 (internal quotation marks omitted). And, again, local school districts in Oklahoma also enjoy this immunity from tort claims, but they are expressly classified as political subdivisions under state statute.

The Court therefore looks holistically at all the facts to evaluate whether the State of Oklahoma has created and treated charter schools (or more narrowly statewide virtual

charter schools) in such a way as to indicate its intent that such schools are part of or an extension of the State's sovereign power. *See Hess*, 513 U.S. at 47; *Good*, 121 F.4th at 820-21. As set forth herein, under Oklahoma law charter schools like Epic further their own interests and retain a significant degree of operational autonomy, particularly in their ability to set curricula, make contracts, manage daily affairs, and select school leadership. The Supreme Court "has consistently refused to construe the [Eleventh] Amendment to afford protection to political subdivisions . . . , even though such entities exercise a 'slice of state power.'" *Lake Country Ests., Inc. v. Tahoe Reg'l Plan. Agency*, 440 U.S. 391, 401 (1979).

The Court therefore concludes that Epic, like ordinary Oklahoma school districts, is intended by the State of Oklahoma to be a political subdivision even if Epic to some extent exercises state powers. When it is not clear that a suit against an entity would implicate the State's dignity, "it does not offend the state's dignitary interests to permit an action against the entity to proceed." *Good*, 121 F.4th at 820.

### C. Summary

Having considered the relevant factors and governing authorities, the Court concludes that, on balance, Epic has not met its burden to show that it is an arm of the State of Oklahoma. Defendant is thus not entitled to dismissal of Plaintiffs' claims on the basis of Eleventh Amendment immunity under Federal Rule of Civil Procedure 12(b)(1).

### CONCLUSION

For the foregoing reasons, Defendant's Motion to Dismiss (Doc. No. 8) is DENIED.

This matter will be set for a status and scheduling conference upon the Court's next available docket.

IT IS SO ORDERED this 17th day of February, 2026.

_Charles B. Goodwin_
CHARLES B. GOODWIN
United States District Judge